35 F.3d 568
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
INDIANAPOLIS LIFE INSURANCE COMPANY, Plaintiff-Appellant,
v.
LUCKY STORES, INC. and Dominick's Finer Foods, Defendants-Appellees.
 No. 93-3073.
 United States Court of Appeals, Seventh Circuit.
 Argued June 7, 1994.
Decided Sept. 6, 1994.
 
 Before CUMMINGS, ALARCON* and EASTERBROOK, Circuit Judges.
 
 ORDER
 
 1
 This action was brought by plaintiff Indianapolis Life Insurance Company ("Indianapolis Life"), an Indiana corporation, alleging that the defendants, Lucky Stores, Inc. ("Lucky") and Dominick's Finer Foods ("Dominick's"), both of Delaware, had breached their lease agreement with the plaintiff. Indianapolis Life sought damages and a declaratory judgment. With the amount in controversy exceeding $50,000, the diversity of the parties' citizenship gave the district court jurisdiction over this dispute. 28 U.S.C. Sec. 1332.
 
 
 2
 Many of the facts in this case are stipulated. The district court heard evidence as to disputed facts in September 1992 and issued its Memorandum Opinion and Order on July 29, 1993, after the parties had completed post-trial submissions. Judgment was entered in favor of both defendants as to all of Indianapolis Life's claims on August 2, 1993. This appeal followed. We have jurisdiction pursuant to 28 U.S.C. Sec. 1291.
 
 
 3
 On appeal, plaintiff explicitly declines to challenge the district court's findings of fact. Pl.Br. at 12. We review the court's legal analysis de novo. Walton v. Jennings Community Hospital, Inc., 999 F.2d 277, 282 (7th Cir.1993). Because the facts as found by the district court dispose of plaintiff's claims, we affirm.
 
 Background
 
 4
 In September 1976 Lucky Stores entered into a 25-year lease, the term of which began in November 1977, with American National Bank & Trust Co. of Chicago as trustee (the "Trustee") of Trust No. 39266 (the "Land Trust"). The lease obligated the tenant to pay, among other things, an annual fixed minimum rent of $118,381. Lucky operated an Eagle Food Stores on the property at 375 N. Halsted Street, Chicago Heights, Cook County, Illinois, from November 1977 until July 1985, when it assigned the lease, as part of a package of lease assignments and sales, to Dominick's Finer Foods. Dominick's decided not to open a store on the property because the facility was too small and because the area was already adequately served by its other stores. The property therefore stood vacant, although Dominick's continued to pay rent on it until at least May 10, 1989, when Dominick's and the Trustee entered into an agreement that purported to terminate the lease between the parties. In exchange for the May 10, 1989, termination of its lease, Dominick's paid one year's rent and taxes.
 
 
 5
 Indianapolis Life is concerned with this transaction because it was a secured creditor of the Land Trust. In October 1977 Indianapolis Life loaned one million dollars to the Land Trust and obtained a mortgage on the property.[1] As additional security for the loan, the Land Trust assigned Lucky's lease to Indianapolis Life. The parties agree that all interests in the property and assignments of the lease were duly recorded.
 
 
 6
 After Dominick's determined that it would not utilize the Land Trust property for a store, it made extensive efforts to find a subtenant for the property. In late 1988, the real estate broker hired by Dominick's located the United States Postal Service as a potential tenant. Negotiations revealed that a sublease was not practicable; therefore Dominick's, the beneficiaries of the Land Trust, and the Postal Service began to negotiate the termination of Dominick's lease so that a new lease could be entered between the Land Trust and the Postal Service. The district court explicitly found that Indianapolis Life was aware of these negotiations and that it knew that the deal involved termination of Dominick's lease rather than a sublease to the Post Office. It found that Indianapolis Life wanted to have the Postal Service as a tenant on the property and considered this a better option than having the property continue to stand vacant with Dominick's as the tenant. The district court meticulously outlined a course of conduct by Indianapolis Life from which it inferred that Indianapolis Life had consented to the termination of Dominick's lease.
 
 
 7
 The Land Trust was late in paying its June 1989 mortgage payment to Indianapolis Life; it never made another payment. From this time until some time in September the Land Trust successfully persuaded Indianapolis Life that the Post Office was on the verge of beginning to pay rent on the property. The district court found as a fact that Indianapolis Life took no immediate action when the mortgage payments became past due "because it knew there was an ongoing transaction regarding the property. The Post Office was entering a lease to become the tenant on the property...." Pl.Short App. at 14. "From this time through January 1990, neither Indianapolis Life nor the beneficiaries of the Land Trust suggested that Dominick's or Lucky represented a potential source of payments." Id.
 
 
 8
 In September 1989 Indianapolis Life learned that the Land Trust had deceived it regarding any lease with the Post Office. Nonetheless, it continued to pursue both the Land Trust and the Post Office in an attempt to collect its past due mortgage payments. In late 1989 the Postal Service broke off negotiations with the Land Trust, having determined that the property did not meet its requirements. Not until January 1990, after it had already initiated foreclosure proceedings,[2] did Indianapolis Life attempt to recover rent payments on the lease from either Lucky Stores or Dominick's. When they resisted making rent payments on the ground that their leases with the Land Trust had been terminated, Indianapolis Life responded that the documents between the parties required its prior written consent to any lease termination, and that absent such a writing the purported lease termination agreement was invalid.
 
 
 9
 The district court rejected such a contention. Its crucial finding of fact was that Indianapolis Life clearly consented to the lease termination, as evidenced by its behavior both prior and subsequent to the execution of the lease termination agreement. We agree with the district court that this fact is fatal to Indianapolis Life's present attempt to hold Dominick's and Lucky to the lease.
 
 Pertinent Documents
 
 10
 The documents upon which Indianapolis Life relies in challenging the validity of the lease termination are the so-called Assignment of Lease by Lessor, executed by the Land Trust when it assigned Lucky's lease to Indianapolis Life in 1977, and the Lessee's Estoppel Certificate, executed by Lucky as part of the same transaction.
 
 
 11
 When the Land Trust assigned Lucky's lease to Indianapolis Life as additional security for the one million dollar loan, the "Assignment of Lease by Lessor" provided that "The Lessors ... will not consent to the termination of the lease prior to the end of the term thereof, and the [Trustee] hereby relinquish[es] all authority to do so without the prior written consent of [Indianapolis Life]." As part of the loan transaction, Lucky, then the tenant on the property, supplied Indianapolis Life with a "Lessee's Estoppel Certificate" representing that Lucky was aware that the lease between it and the Land Trust had been assigned to Indianapolis Life, and representing that it would notify Indianapolis Life within 15 days of matters affecting the terms of the lease. When Lucky assigned its lease to Dominick's, this Estoppel Certificate was appended to the documentation, as was a copy of the lease assignment from the Land Trust to Indianapolis Life.
 
 
 12
 Indianapolis Life argues that "In assigning the Lucky lease to Indianapolis Life, the Land Trust contractually relinquished its right and power to terminate the lease without the express written consent of Indianapolis Life." Pl.Br. at 17. It also argues that Dominick's had both actual and constructive notice that the Land Trust lacked the power to terminate the lease without Indianapolis Life's prior written consent. It therefore concludes that "By operation of law, the Lease Termination Agreement between Dominick's and the Land Trust was invalid and of no effect because the Land Trust did not obtain Indianapolis Life's prior written consent." Id. at 18.
 
 Analysis
 
 13
 We agree with Indianapolis Life that without its written consent the Land Trust lacked the authority to terminate the lease.[3] But Indianapolis Life itself did not lack such authority; it had been assigned the lease by the Land Trust. The very Assignment of Lease by Lessor upon which Indianapolis Life relies in challenging the Land Trust's authority to terminate the lease provided that, so long as Indianapolis Life remained a mortgagee of the property, it was empowered to determine whether or not to terminate the lease. And while any decision on the part of Indianapolis Life to vest in the Land Trust the authority to terminate the lease was required to be conveyed in writing, nothing required that Indianapolis Life's own authority to agree with the lessee to terminate the lease be exercised in writing. Indianapolis Life was free to consent to the termination of Dominick's lease in any manner it saw fit.
 
 
 14
 The district court found as a fact, and Indianapolis Life does not challenge its determination, that Indianapolis Life actually consented to the termination of Dominick's lease. Pl.Short App. at 15, 17, 24, 25. The district court inferred Indianapolis Life's consent from its conduct both prior and subsequent to the execution of the purported lease termination agreement between the Land Trust and Dominick's. Indianapolis Life was not required to transact the lease termination in writing; in this case, as the district court found, it engaged in a course of conduct that clearly demonstrated its consent to the termination of Dominick's lease and its desire for a new lease with a preferable tenant.
 
 Conclusion
 
 15
 Indianapolis Life argues that without its prior written consent, the Land Trust was without authority to terminate Dominick's lease. Indianapolis Life, however, on account of the Assignment of Lease by Lessor, was vested with such authority. Indianapolis Life exercised its authority to terminate Dominick's lease by engaging in a course of conduct that clearly demonstrated its consent to the lease termination. For these reasons, the decision of the district court is affirmed.
 
 
 
 *
 The Honorable Arthur L. Alarcon, of the United States Court of Appeals for the Ninth Circuit, is sitting by designation
 
 
 [1]
 This transaction was part of a larger transaction involving a construction loan made by B.A. Mortgage Co. to the Land Trust
 
 
 [2]
 Indianapolis Life became the record owner of the property at a sheriff's sale in November 1990
 
 
 [3]
 We note, however, that Indianapolis Life's behavior subsequent to learning of the purported lease termination between the Land Trust and Dominick's could well give rise to a finding that Indianapolis Life had waived its right to challenge the validity of the lease termination agreement, were it not that the Assignment of Lease by Lessor contains a clear "non-waiver" clause